IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHELE SOUDERS,<br>on behalf of Plaintiff and the class members<br>described below,<br><br>      Plaintiff,<br><br>  vs.<br><br>NORTHERN STAR LENDING LLC;<br>CRYSTAL CHAPMAN-CHEVALIER;<br>WOLF RIVER DEVELOPMENT COMPANY;<br>and JOHN DOES 1-20,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   JURY TRIAL DEMANDED<br>)<br>)<br>)<br>) |

**COMPLAINT – CLASS ACTION**

1. Plaintiff Michele Souders ("Plaintiff") brings this action to secure redress from predatory and unlawful loans (such as <u>Exhibit A</u>). The loans are made in the name of Defendant Northern Star Lending LLC. Other parties involved in making the loans are Crystal Chapman-Chevalier, Wolf River Development Company, and John Does 1-20.

2. Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964 (Count II).

**JURISDICTION AND VENUE**

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 15 U.S.C. § 1692k (FDCPA), 18 U.S.C. § 1964 (RICO), 28 U.S.C. § 1337 (interstate commerce), and 28 U.S.C. § 1367 (supplemental jurisdiction). Jurisdiction may also exist under 28 U.S.C. § 1332(d) (Class Action Fairness Act).

4. This Court has personal jurisdiction over Defendants because they:

    a. Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that

personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

        b.     Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

5.     Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Indiana.

6.     Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

7.     Plaintiff Michele Souders is a natural person and resident of Indianapolis, Indiana.

**Defendants**

8. Defendant Northern Star Lending LLC is an online lender that offers loans to consumers at annual percentage rates of more than 700%. (Exhibit A) It purports to be an entity formed under the laws of, and claims to be owned and controlled by, the Menominee Tribe of Wisconsin, a federally-recognized Indian Tribe. It uses the address P.O. Box 818, Keshena, WI 54135. (Exhibit A, first page)

9. Northern Star Lending LLC operates through the website www.northernstarlending.com. The domain registry for www.northernstarlending.com is a nominee. (Exhibit B)

10. Defendant Crystal Chapman-Chevalier is the Chief Executive Officer of the Wolf River Development Company. (Exhibit C)

11. Defendant Wolf River Development Company is an entity located at W2907 Tribal Office Loop Road, Keshena, WI 54135. It purports to have "lending offices" at W2818 Warrington Road, Keshena WI 54135.

12. The activities of the Wolf River Development Company include high-interest loans. (Exhibit D)

13. Northern Star Lending LLC is one of multiple high-interest lending entities supposedly owned by the Menominee Indian Tribe. Others include:

    a. Moose Lending, LLC;

    b. Elk Lending, LLC;

    c. Fox Lending, LLC d/b/a Loop Fund;

    d. West Side Lending, LLC;

    e. East Line Lending LLC; and

    f. Crane Finance.

14. All of these entities are operated by Wolf River Development Company through two subsidiaries, Four Directions Lending LLC and Five Clans Lending LLC. (Exhibits E-F)

15. On information and belief, vast majority of the economic benefit of the activities of Northern Star Lending LLC is received by non-Native American persons.

16. Northern Star Lending LLC does business in Indiana over the Internet, via text message, via Automated Clearing House transactions, and over the telephone.

17. On information and belief, the actual lending operations were carried out and continue to be carried out in locations other than tribal lands. The operations that are not conducted on tribal land include lead generation, marketing, funding, underwriting, payment processing, and collection.

18. The funds lent are transferred by ACH credit to the borrowers' bank accounts throughout the United States.

19. Repayment of the loans is made by ACH debit from the borrowers' bank accounts throughout the United States.

20. Defendants' lending does not actually occur on the Tribe's reservation.

21. A significant majority of the transaction occurs within the State of Indiana – applying for the loan and receiving and collecting the funds.

22. The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

23. Defendants John Does 1-20 are other natural and artificial persons involved in the lending activities described herein.

**FACTS RELATING TO PLAINTIFF SOUDERS' LOAN**

24. On or about August 11, 2023, Plaintiff Souders took out an installment loan from Northern Star Lending LLC (Exhibit A). The loan had an amount financed of $425 and an annual

percentage rate of 776.02%.

26. Exhibit A is a standard form loan agreement used by Northern Star Lending LLC on a regular basis.

26. Defendants regularly make loans to individuals in Indiana at such rates.

27. The Northern Star Lending LLC website lists states in which Defendants will not make loans. (Exhibit G) Indiana is not one of these states.

28. Defendants sought out Indiana residents for such loans.

29. The loan was obtained for personal, family or household purposes and not for business purposes.

30. Plaintiff made some of the payments, including interest.

31. The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

32. The loan was made entirely via the Internet.

33. The loan was to be repaid via ACH.

34. Plaintiff has never set foot on the Tribe's land.

35. Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

## INDIANA REGULATION OF LENDING

36. The Indiana Uniform Consumer Credit Code establishes a maximum loan finance charge of 36% per annum for consumer loans.

37. With respect to loans other than supervised loans, Ind. Code § 24-4.5-3-201, provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

38. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind.

Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
> > (a) the total of:
> >
> > > (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;
> > >
> > > (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
> > >
> > > (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or
> >
> > (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

39.     There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it does not authorize 776% rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

40.     Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

> (1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.
>
> (2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).
>
> (3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).
>
> (4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However,

notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

41. The amount of finance charge provided for in <u>Exhibit A</u> is more than double that permitted in Indiana under any provision.

42. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

  (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

  (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

  (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

  (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

  (a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

  (b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

>    (a) An agreement that the law of another state shall apply.

>    (b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

>    (c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

43.    Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **if the debtor has paid an excess charge the debtor has a right to a refund**. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) **If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award **reasonable attorney's fees** incurred by the debtor. . . .  (Emphasis added)

## RENT-A-TRIBE SCHEMES

44.    In an attempt to evade prosecution under usury laws of states like Indiana, non-tribal

8

owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

45. Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

46. The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

47. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

48. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

49. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

50. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively

nil.

51. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

52. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

53. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

54. The excessive interest charges imposed by Defendants were intentional.

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

55. Plaintiff incorporates paragraphs 1-54.

56. Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

57. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

58. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan

was made in the name of Northern Star Lending LLC at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

59. Plaintiff may alter the class definition to conform to developments in the case and discovery.

60. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

61. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

62. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

63. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

64. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i. Statutory damages;

        ii. Attorney's fees, expenses and costs; and

        iii. Such other or further relief as is appropriate.

## COUNT II – RICO

65. Plaintiff incorporates paragraphs 1-54.

66. This claim is against Crystal Chapman-Chevalier and the Does, who are the RICO "persons."

67. All loans made in the name of Northern Star Lending LLC to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

68. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

69. Northern Star Lending LLC is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

70. Defendants Crystal Chapman-Chevalier and the Does are associated with this enterprise.

71. Defendant Crystal Chapman-Chevalier and the Does conducted or participated in the conduct of the affairs of Northern Star Lending LLC through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

72. Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

73. Plaintiff brings this claim on behalf of a class.

74. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Northern Star Lending LLC at more than 72% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

75. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

76. There are questions of law and fact common to the class members, which common

questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether the loans at issue are "unlawful debts" as defined in RICO.

    b. Whether Northern Star Lending LLC is an "enterprise."

    c. Whether Defendant Crystal Chapman-Chevalier is associated with Northern Star Lending LLC.

    d. Whether the Does are associated with Northern Star Lending LLC.

    e. Whether Defendants Crystal Chapman-Chevalier and the Does each conducted or participated in the affairs of Northern Star Lending LLC through a pattern of making and collecting unlawful loans.

77. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

78. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

79. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Treble damages;

    ii. Attorney's fees, litigation expenses and costs of suit; and

    iii. Such other or further relief as the Court deems proper.

/s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER
        & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## NOTICE OF ASSIGNMENT

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

>       */s/ Daniel A. Edelman*
>       Daniel A. Edelman

Daniel A. Edelman
**EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC**
20 S. Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## **DOCUMENT PRESERVATION DEMAND**

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of these claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that such Defendant request that the third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of each Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman